# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLOBAL CHEMICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> INDEMIL INDUSTRIA E COMERCIO S.A., <br><br> Defendant. | Civil Action No.: 25-00912 (JXN)(CF) <br><br> **<u>OPINION</u>** |

**<u>NEALS</u>**, District Judge

Before the Court is Defendant Indemil Industria E Comercio S.A.'s ("Indemil" or "Defendant") motion to dismiss Plaintiff Global Chemicals Corporation's ("GCC" or "Plaintiff") Complaint for lack of personal jurisdiction, improper venue, and insufficient service of process pursuant to Federal Rules of Civil Procedure[1] 12(b)(2), (b)(3) and (b)(5). (ECF No. 23.) GCC opposed the motion (ECF No. 25), and Indemil replied in further support (ECF No. 26). GCC then filed a sur-reply. (ECF No. 31.)[2] The Court has carefully reviewed the Complaint and the parties' submissions and decides this matter without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendant's motion to dismiss is **DENIED**.

## I. **<u>BACKGROUND</u>**[3]

GCC, a New Jersey corporation, wholesales and distributes natural and synthetic ingredients and specialty chemicals. (*See* Compl. ¶¶ 1–2, ECF No. 1.) Indemil, a Brazilian

---

[1] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

[2] On July 2, 2025, GCC requested to file a sur-reply (ECF No. 27), which the Court granted via a Text Order on July 7, 2025 (ECF No. 29).

[3] When reviewing a motion to dismiss, a court accepts as true all well-pleaded facts in the complaint. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

corporation, manufactures specialty chemicals. (*Id.* ¶¶ 3, 5.) Between 2021 and 2024, GCC placed

four orders with Indemil to buy Citric Acid Anhydrous Fine Granular ("CAAFG"). (*Id.* ¶¶ 10–14.)

This case arises from the fourth such order.

On August 6, 2024, GCC employees met with Indemil employees, including Indemil's

CEO Eizo Miyamoto ("Miyamoto"), in São Paulo, Brazil, at a trade show. (*See id.* ¶¶ 15–18.) GCC

alleges that at the trade show, Indemil representatives discussed expanding into Southeast Asia,

particularly Vietnam, and potentially opening a subsidiary in North Carolina. (*Id.* ¶¶ 4, 17–18.)

On September 4, 2024, Jessica Shen ("Shen"), a GCC sourcing/purchasing associate,

introduced herself as the new point of contact to Patricia Cruz ("Cruz"), a supervisor at Indemil.

(*See id.* ¶ 20.) On September 17, 2024, Cruz offered GCC a 5% discount on orders if GCC made

payment to Indemil's Vietnam bank account, citing a difference in tax rates. (*Id.* ¶ 21.) GCC did

not reply. (*Id.*) In October, Cruz again offered GCC a discount for orders made in that month. (*Id.*

¶ 22.) Shen emailed Cruz for a quote on 280 metric tons of CAAFG at a discount. (*Id.* ¶ 23.) Cruz

replied that Indemil was awaiting pricing information from its suppliers, and the discount would

apply upon 50% prepayment. (*Id.* ¶¶ 24, 25.)

On October 30, 2024, Cruz gave Shen a discounted price of $1,390/metric ton of CAAFG

and sent an invoice from "Nishi Ingredientes LTDA" with two pricing options: a lower price if

GCC pre-paid 50% and a higher price if GCC pre-paid 30%. (*See* Compl. ¶¶ 26–28.) The next day,

Shen accepted the lower price and higher prepayment option, but requested an updated invoice,

explaining GCC could not pay "Nishi Ingredientes." (*Id.* ¶ 29.) After further negotiations, on

November 7, 2024, Cruz sent signed and stamped Purchase Orders 1723 and 1724 ("Purchase

Orders") from Indemil to GCC. (*See* GCC Opp'n Ex. D at *82, ECF No. 25-1.) The Purchase

Orders, collectively, were for 280 metric tons of CAAFG, totaling $403,200, and split across two

shipments. (Compl. ¶¶ 30–32.) The back of the Purchase Orders[4] stated the terms and conditions for the transaction, including penalties for failure to deliver on time and legal fees. (*Id.* ¶¶ 33–36; Purchase Order 1723 at *131; Purchase Order 1724 at *140.)

Also, on November 7, 2024, Cruz stated prepayment was required before CAAFG production would begin, and again directed GCC to send payment to Indemil's Vietnam Bank Account. (*See* Compl. ¶ 37.) Shen confirmed GCC would remit payment but requested product samples within eight days, which Cruz guaranteed would be provided. (*Id.* ¶¶ 38–39.) Shen also requested a Zoom meeting with Indemil's accountant to confirm bank details. (*Id.* ¶ 40.) Soon after, Shen received an email with wiring information purporting to be from Miyamoto. The email, however, did not come from "indemil.com," but "lndemil.com," a website using a lowercase "L" instead of an uppercase "I," causing the domain name to appear identical (i.e., "Indemil" vs. "lndemil"). (*Id.* ¶¶ 40–42.) Shen did not spot the difference and wired $161,280 to the impostor's bank account on November 8, 2024.[5] (*Id.* ¶ 45.)

Following payment, GCC Vice President Alex Augatis ("Augatis") emailed Cruz and Indemil sales manager Tito Garcia Saorin ("Saorin") several times without receiving a response. (*See id.* ¶¶ 46–48.) On November 26, 2024, Augatis called Saorin, who explained that he was unaware that GCC had ever made payment and that Cruz was on vacation. (*Id.* ¶ 49.) On December 2, 2024, Shen followed up and received no response. (*Id.* ¶ 50.) Augatis contacted Saorin the next day, who responded by requesting Miyamoto be excluded from all further communication,

---

[4] The Purchase Orders have identical terms and conditions. (*See* GCC Opp'n Ex. D at *128–31 ("Purchase Order 1723"), ECF No. 25-1; GCC Opp'n Ex. E. at *137–40 ("Purchase Order 1724"), ECF No. 25-1.)

[5] The Court notes the rise in character substitution in false emails, known as "homograph attacks" to bypass spam filters and trick users into thinking a phishing email or fake URL is legitimate. *See Homograph Attacks: How Hackers Exploit Similar-Looking Characters in Domain Names*, Domain Mag., https://domainmagazine.com/homograph-attacks-how-hackers-exploit-similar-looking-characters-in-domain-names/ (last visited December 22, 2025). To demonstrate the difficulty in identifying the difference between "Indemil" and "lndemil" upon cursory review, the Court has changed Indemil to lndemil at an undisclosed point in this Opinion.

confirming the samples would be ready by December 10, 2024, and inquiring whether the 40% prepayment had been made. (*Id.* ¶¶ 50—52.) Saorin also showed the GCC team an email allegedly from Shen on November 8, 2024—the same day GCC wired funds to the impostor's bank account—stating, "Pls ignore my earlier payment mail, it was an error." (*Id.* ¶ 53.) The purported email from Shen, however, did not come from "globalchemicalscorp.com," but "globalchernicalscorp.com," a domain using a lowercase "r" and "n" to look like a lowercase "m" (i.e., "globalchemicals" vs. "globalchernicals"). (*Id.* ¶¶ 54—56.)

Two days later, Saorin explained Indemil's accounting department had not validated the wire transfer. (*See id.* ¶ 59.) On December 11, 2024, Saorin, Cruz, Augatis, and Shen met over Zoom. (*Id.* ¶¶ 60—65.) Saorin informed the GCC team that: (1) the samples were ready to be shipped the following day; (2) Indemil does not have a Vietnam bank account; (3) the Purchase Orders were not authentic because the stamp numbers did not match Indemil's company registration numbers; (4) Indemil never received the purchase order and that the pricing for CAAFG was $1,930 per metric ton; (5) there was no email confirming the prepayment; and (6) Saorin denied receiving prepayment confirmation emails and directed Cruz to show a saved copy of the alleged email from Shen, being unable to find the email in her inbox. (*Id.* ¶¶ 66—71.) The Zoom meeting concluded with an agreement to set a meeting with Miyamoto. The next day, however, Saorin accused GCC of forging emails and severed communication between the companies. (*Id.* ¶¶ 73—77.)

GCC filed this action on February 3, 2025, alleging breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); conversion (Count III); fraud (Count IV); fraudulent misrepresentation (Count V); fraudulent inducement (Count VI); negligent

misrepresentation (Count VII); unjust enrichment (Count VIII); and quantum meruit (Count IV). (*See id*. ¶¶ 92-158.)

On April 24, 2025, Indemil moved to dismiss. (Indemil Moving Br., ECF No. 23). GCC filed a brief in opposition (GCC Opp'n, ECF No. 25), Indemil filed a reply in further support of the motion to dismiss (Indemil Reply, ECF No. 26), and GCC filed a sur-reply (GCC Sur-Reply, ECF No. 31). This motion is now fully briefed and ripe for the Court to decide.

## II.    LEGAL STANDARD

### A.    Rule 12(b)(2) - Lack of Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff "bears the burden of demonstrating the facts that establish personal jurisdiction." *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). When the Court does not hold an evidentiary hearing on a 12(b)(2) motion, "the plaintiff need only establish a prima facie case of personal jurisdiction and the plaintiff is entitled to have [their] allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citation modified). "The plaintiff meets this burden and presents a prima facie case for the exercise of personal jurisdiction by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum state.'" *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (quoting *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n.,* 819 F.2d 434 (3d Cir. 1987)).

Plaintiff cannot solely rely on the pleadings to survive a Rule 12(b)(2) motion. *Patterson v. FBI*, 893 F.2d 595, 604 (3d Cir. 1990) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)). Personal jurisdiction "is inherently a matter which requires resolution of factual issues outside the pleadings." *Id.* at 603 (quoting *Time Share Vacation Club*,

735 F.2d at 67 n.9). "Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Id.* at 603-04 (quoting *Time Share Vacation Club*, 735 F.2d at 67 n.9).

### B.    Rule 12(b)(3) - Improper Venue

Generally, "venue provisions are designed, not to keep suits out of the federal courts, but merely to allocate suits to the most appropriate or convenient federal forum." *Brunette Mach. Works, Ltd. v. Kockum Indus., Inc.*, 406 U.S. 706, 710 (1972); *Gulden v. Exxon Mobil Corp.,* No. 24-7381, 2025 WL 1549313, at *2 (D.N.J. May 30, 2025). "A party believing it has been sued in an improper federal venue may move to dismiss or transfer venue under Rule 12(b)(3)." *Gulden*, 2025 WL 1549313, at *2. *See* 28 U.S.C. § 1406(a) (stating that a court granting a Rule 12(b)(3) motion "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought"). The moving party has the burden of showing improper venue. *Myers v. Am. Dental Ass'n*, 695 F.2d 716, 724–25 (3d Cir. 1982).

Generally, "it is not necessary for the plaintiff to include allegations in his complaint showing that venue is proper." *Great W. Mining & Min. Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86-87 (3d Cir. 2011) (citation omitted); *Gulden*, 2025 WL 1549313, at *2. In ruling on a Rule 12(b)(3) motion, the Court accepts all venue-related allegations as true, "unless those allegations are contradicted by the defendants' affidavits." *Bockman v. First Am. Mktg. Corp.*, 459 F. App'x 157, 158 n.1 (3d Cir. 2012) (citation omitted). The Rules have no "specific venue provisions or requirements. The Court must determine whether venue is proper in accordance with the appropriate statutes when deciding a motion to dismiss for improper venue." *Plastic Surgery Ctr. v. Blue Cross Blue Shield of Mich.*, No. 13-02536, 2013 WL 5773120, at *1 (D.N.J. Oct. 23, 2013).

### C.     Rule 12(b)(5) - Insufficient Process

A party may move to dismiss for insufficient service of process. Fed. R. Civ. P. 12(b)(5). "When a party moves to dismiss under Rule 12(b)(5), the party making the service has the burden of demonstrating its validity." *Laffey v. Plousis*, No. 05-2796, 2008 WL 305289, at *3 (D.N.J. Feb. 1, 2008) (internal quotation marks omitted). Dismissals for insufficient service of process, however, must be *without* prejudice. *Umbenhauer v. Woog*, 969 F.2d 25, 30 n.6 (3d Cir. 1992) (citing *Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 875 (3d Cir. 1944)).

## III.     <u>ANALYSIS</u>

### A.     Personal Jurisdiction

Courts "may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state" so long as jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007). This is a two step process: the Court first looks to the state law requirements and then to the constitutional requirements. *IMO Indus., Inc. v. Kiekart AG*, 155 F.3d 254, 259 (3d Cir. 1998). In New Jersey, the first step collapses into the second because "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing N.J. Ct. R. 4:4-4(c)). Personal jurisdiction is constitutionally proper if (1) there are "minimum contacts" between the defendant and the forum; and (2) jurisdiction over the defendant comports with "fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The question is whether the defendant "purposefully established minimum contacts in the forum State." *Id.* at 476. A defendant must have "fair warning" that its conduct will subject it to the jurisdiction of a foreign court. *Id.* at 472.

Put simply, a defendant's conduct and "contacts with the forum state must be 'such that he should reasonably anticipate being haled into court there.'" *Ackourey v. Sonellas Custom Tailors*, 573 F. App'x 208, 211 (3d. Cir. 2014) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

A court can have general or specific personal jurisdiction over a defendant. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). General jurisdiction extends to all claims. *Id.* "Those claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world." *Id.* Specific jurisdiction extends only to cases "aris[ing] out of or relate[d] to the defendant's contacts" with the forum state. *Id.* at 359 (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)).

Parties can consent to personal jurisdiction. *See Burger King Corp.*, 471 U.S. at 472 n.14; *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 138 (2023). Personal jurisdiction is a legal right, and "a party may bargain it away where that party perceives the bargain as advantageous." *Park Inn Int'l, L.L.C. v. Mody Enters., Inc.*, 105 F. Supp. 2d 370, 374 (D.N.J. 2000). "[T]here are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'" *Burger King Corp.*, 471 U.S. at 472 n.14 (quoting *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). "[P]articularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction." *Id.* (citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964)). "[C]ontractual consent to personal jurisdiction should be enforced unless it would be unreasonable or unjust to do so." *Park Inn Int'l*, 105 F. Supp. 2d at 373 (citing *Burger King Corp.*, 471 U.S. at 472 n.14). Courts will invalidate a forum selection clause "only if it was the product of fraud or overreaching, if the agreed forum is so inconvenient as to deprive the litigant of his day

in court, or where enforcement would contravene a strong public policy of the forum in which the suit is brought." *Id.* (quoting *The M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10 (1972)).

Here, after extensive email communication, Cruz sent Shen signed and stamped Purchase Orders, stating the total contract amount ($403,200) and including all the appropriate contract details. (*See* Compl. ¶¶ 26-28). There have been four transactions between GCC and Indemil (*id.* ¶ 10); all four orders were in English, with no request for translation into Portuguese. (*See* Hsu Decl. ¶ 29, ECF No. 25-1 at *7.[6]) The parties negotiated the Purchase Orders, and the terms remained unchanged across all four orders over three years. (*Id.*¶¶ 8, 12, 16, 28.)

The Purchase Orders contain the same choice of law and forum selection clause, which remained unchanged from the previous three orders. (*See* Purchase Order 1723 at *131; Purchase Order 1724 at *140.) It states:

> GOVERNING LAW AND JURISDICTION: The interpretation, performance and enforcement of this contract shall be conducted in accordance with and shall be controlled by, first and foremost, this contract and terms and conditions of purchase with preemptive force and effect and other applicable laws and regulations of the State of New Jersey and the United States of America. All disputes, legal actions or proceedings arising out of or in connection with this Contract and all other transactions between the Seller and the Buyer shall be litigated and tried in and adjudicated exclusively by competent judicial court(s) in New Jersey. *The choice of New Jersey as venue for both parties is hereby stipulated as exclusive and mandatory and is not negotiable or permissive in nature, thereby excluding the possibility of litigating in any jurisdiction other than New Jersey.* Each party hereby waives any right it may have to assert the doctrine of forum non-convenience or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this paragraph, and *stipulates that the State and/or Federal courts located in New Jersey shall have in personam jurisdiction and venue over each of them for the purpose of resolving or litigating any dispute, controversy, or proceeding arising out of or related all transaction(s) between the Seller and the Buyer.* Each party hereby authorizes and accepts service of process sufficient for personal jurisdiction in any action against it as contemplated by this paragraph by registered or certified mail, return receipt requested, postage prepaid, to its address for the giving of notices as set forth in this Contract.

---

[6] Page numbers preceded by an asterisk (*) refer to CM/ECF pagination.

(*Id*. (emphasis added).)

Faced with the plain language of the forum selection clause, Indemil makes two arguments. First, Indemil claims it did not understand the implications of the forum selection clause; if it had, it would not have agreed to the provision. (Indemil Moving Br. at 11-13.) Second, because the Complaint alleges a series of fraudulent communications, Indemil argues "the Court cannot accept Plaintiff's bare assertion that Mr. Miyamoto signed a valid contract with a New Jersey forum selection clause, especially in the absence of documentary proof." (*Id.* at 17.)

Neither argument persuades. To start, the record demonstrates Indemil and GCC are both sophisticated parties who completed multiple transactions together. They negotiated all their purchase orders in English and never sought translation or language accommodations. The forum selection clause was included in every purchase order the parties executed. Indemil was, in other words, "sufficiently competent . . . to read this fairly straightforward contract, or to perceive the need to hire an attorney to read it for them." *Park Inn Int'l*, 105 F. Supp. 2d at 375.

In any event, accepting an offer "creates a conclusive presumption that the signer read, understood, and assented to its terms." *Fleming Cos., Inc. v. Thriftway Medford Lakes, Inc.*, 913 F. Supp. 837, 843 (D.N.J. 1995). Buyer's remorse is not a defense. *Park Inn Int'l*, 105 F. Supp. 2d at 374 ("Failure to explain the terms of an agreement does not constitute fraud, overreaching or unconscionability so as to void a forum selection clause."). The "critical inquiry is whether the provision had been reasonably communicated by the agreement." *Measurement Specialties, Inc. v. Exergen Corp.*, No. 24-8369, 2025 WL 1720466, at *3 (D.N.J. June 20, 2025) (quoting *Vidal v. Tom Lange Co. Int'l, Inc.*, No. 21-1286, 2021 WL 4963276, at *3 (D.N.J. Oct. 26, 2021)).

Here, the Purchase Orders reasonably communicated the forum selection clause. Page five contained the terms and conditions. The top of each of the preceding four pages stated that terms

could be "See[n] Below." (Purchase Order 1723 at *128-30; Purchase Order 1724 at *137-39.) The bottom of those pages advised "[t]his purchase order/contract and the terms and conditions of purchase supersede Seller's sales confirmation/contract and terms and conditions of sale(s)." (*Id.*) Therefore, each page warned the reader that the Purchase Orders had binding terms. Moreover, the forum selection clause itself was conspicuously titled "**GOVERNING LAW AND JURISDICTION**." (Purchase Order 1723 at *131; Purchase Order 1724 at *140.) This is not a case with "a forum selection clause ensconced in a paragraph subtitled something unrelated to forum selection, which subparagraph is contained in a contract labeled something other than an [purchase and sale] contract." *Vidal*, 2021 WL 4963276, at *4. Nor is the forum selection clause ambiguous: it clearly states New Jersey state and federal courts have personal jurisdiction and venue over disputes arising out of the Purchase Orders. *See, e.g.*, *Harfouche v. Wehbe*, 950 F. Supp. 2d 766, 771 (D.N.J. 2013) (finding forum selection clause ambiguous where it stated an action may be brought in "specialized courts in Lebanon and the United States of America."). Accordingly, the forum selection clause in the Purchase Orders is valid and enforceable.

Next, the mere fact that the Complaint alleges fraudulent communications does not mean Purchase Orders (or Miyamoto's signature) were themselves fraudulent. "To invalidate a forum-selection clause on the basis of fraud, the party challenging the clause must show that the forum selection clause itself was procured through fraud." *Ross Univ. Sch. of Med. v. Amini*, No. 13-6121, 2014 WL 29032, at *4 (D.N.J. Jan. 2, 2014). Indemil does not make such a showing, instead arguing that fraud somewhere (in an email with wiring instructions) is fraud everywhere (in the Purchase Orders themselves). This is unpersuasive.

Here, every other purchase order had the exact same forum selection clause. (*Compare* Purchase Order 1723 at *131, *and* Purchase Order 1724 at *140, *with* GCC Opp'n Ex. A at *18

11

(terms and conditions for first order), GCC Opp'n Ex. B at *56 (terms and conditions for second order), *and* GCC Opp'n Ex. C at *64 (terms and conditions for third order)). It strains logic to assert fraud produced an identical provision the fourth time around. To the extent Indemil implies that Miyamoto's signature on Purchase Order 1724 was forged or fraudulent, at this stage, that argument similarly fails, because Cruz sent the signed Purchase Order 1724 to GCC *from her Indemil email account*. (*See* GCC Opp'n Ex. D. at *82.) Indemil's acceptance, therefore, did not come from an impersonator.[7]

Taking GCC's allegations as true and resolving all factual disputes in GCC's favor, when the parties entered the Purchase Orders, they agreed to resolve their disputes, including this one, in New Jersey. The Court finds the parties validly entered the forum selection clause. The Court also finds "it is not so burdensome, unfair, inconvenient or oppressive as to prevent the Court from enforcing it on that ground." *Park Inn Int'l*, 105 F. Supp. 2d at 375. "Defendants have not shown that the added cost of defending themselves in the District of New Jersey will be so prohibitive to them as to deprive them of their day in Court." *Id.* The Court, therefore, has personal jurisdiction over Indemil and **denies** Indemil's Rule 12(b)(2) motion.

### B.    Venue

Venue is proper in: (1) "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located"; (2) "a judicial district in which a

---

[7] Indemil claims, for the first time in its reply brief, that Purchase Order 1723 and 1724 were for wholly separate transactions, and 1723 is the operative Purchase Order in this transaction. (*See* Indemil Reply 6-7.) This is significant, says Indemil, because GCC failed to include a signed copy of Purchase Order 1723 in its exhibits. "Because this argument was raised for the first time in [Indemil's] Reply Brief, it is waived." *United States v. Heilman*, 377 F. App'x 157, 188 (3d Cir. 2010). Even if Indemil did not waive the argument, it lacks merit. The record demonstrates the parties negotiated and signed both Purchase Orders at the same time as part of the same transaction. (*See* GCC Opp'n Ex. D. at *82.) This was not the first time the parties split one order across two shipments. (*See* Hsu. Decl. ¶ 9.) Moreover, at this stage, the Court takes GCC's well-pled factual allegations as true. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citation modified). Here, GCC adequately pleads Indemil signed Purchase Order 1723. (Hsu Decl. ¶ 18.)

substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"; or (3) "if there is no district in which an action may otherwise be brought . . . , any judicial district in which any defendant is subject to the court's personal jurisdiction." 28 U.S.C. § 1391(b). When venue is challenged, "the [C]ourt must determine whether the case falls within one of the three categories set out in § 1391(b)." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 56 (2013). "If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred . . . ." *Id.*

But § 1391(b)'s venue requirements do not "impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue." 28 U.S.C. § 1406. In other words, "[l]ike personal jurisdiction, an objection to venue may be waived." *Park Inn Int'l*, 105 F. Supp. 2d at 375. As with personal jurisdiction, parties may waive objections to venue by contract. *See id.* "When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations." *Atl. Marine*, 571 U.S. at 66. "A forum-selection clause, after all, may have figured centrally in the parties' negotiations and may have affected how they set monetary and other contractual terms; it may, in fact, have been a critical factor in their agreement to do business together in the first place." *Id.* "In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain." *Id.*

Here, the forum selection clause in the Purchase Orders unambiguously states:

> The choice of New Jersey as venue for both parties is hereby stipulated as exclusive and mandatory and is not negotiable or permissive in nature, thereby excluding the possibility of litigating in any jurisdiction other than New Jersey. Each party hereby waives any right it may have to assert the doctrine of forum non-convenience or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this paragraph . . . .

(*See* Purchase Order 1723 at *131; Purchase Order 1724 at *140.) As discussed above, this clause is valid and enforceable. The parties chose New Jersey as a venue, and this is not "all but the most unusual" case. *Atl. Marine*, 571 U.S. at 66. Accordingly, the Court will hold the parties to their agreement. And, because Indemil expressly agreed to waive any objection to venue, even if New Jersey was the wrong venue, Indemil's objection is neither "timely" nor "sufficient."[8] 28 U.S.C. § 1406. *See also Park Inn Int'l*, 105 F. Supp. 2d at 376 ("[B]ecause defendants previously waived their objection to venue, the instant motion is not 'timely or sufficient.'"). Accordingly, the Court **denies** Indemil's 12(b)(3) motion.

### C.    Service

GCC served Indemil by registered mail. (Hsu Decl. ¶ 52; GCC Opp'n Ex. G ("Service of Process"), ECF No. 25-2 at *60-63.) Indemil argues that GCC failed to comply with the international service requirements of the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention" or "Convention"). (Indemil Moving Br. at 8-13.) GCC argues it did not need to serve Indemil under the Convention; the Purchase Orders allowed GCC to effect service by registered mail. (GCC Opp'n at 14-23.)

Rule 4 governs service of process. The Rule provides a corporation outside the United States may be served (1) "by any internationally agreed means of service that is reasonably

---

[8] Because the parties agreed to New Jersey as a venue, the Court need not reach whether venue is proper under § 1391(b). But in any event, venue would be proper under § 1391(b). To start, a substantial portion of the events giving rise to this litigation took place in New Jersey. In a contract action, "the factors determining where the claim arose include where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred." *Ferratex, Inc. v. U.S. Sewer & Drain, Inc.*, 121 F. Supp. 3d 432, 440 (D.N.J. 2015) (quoting *Frato v. Swing Staging, Inc.*, No. 10-5198, 2011 WL 3625064, at *4 (D.N.J. Aug. 17, 2011)). Here, the contract was negotiated, at least in part, in New Jersey. The contract was to ship chemicals from Brazil to New Jersey. And the breach took place when those chemicals never arrived in New Jersey. Even if a substantial portion of the events giving rise to this action did *not* take place in New Jersey, venue would nonetheless be proper because, as discussed above, this Court has personal jurisdiction over Indemil. 28 U.S.C. § 1391(b)(3).

calculated to give notice, such as those authorized by the [Hague Service Convention]"; (2) under certain circumstances, a method "that is reasonably calculated to give notice" and complies with the foreign country's laws; or (3) "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f).

The Hague Service Convention is a treaty with the force of federal law. U.S. Const. Art. VI. The Convention is "mandatory in all cases to which it applies," *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705 (1988), and "pre-empts inconsistent methods of service prescribed by state law in all cases to which it applies," *id.* at 699. The Convention applies when serving a foreign defendant in a signatory country. *Id.* "[I]n cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law." *Water Splash, Inc. v. Menon*, 581 U.S. 271, 284 (2017).[9] "Failure to comply with the Convention voids the attempted service." *Shenouda v. Mehanna*, 203 F.R.D. 166, 170 (D.N.J. 2001)

Brazil signed the Convention but objects to service of process by mail. *See Brazil*, Hague Conf., https://www.hcch.net/en/states/authorities/details3/?aid=1113 (last visited December 19, 2025). GCC served Indemil in Brazil by mail. Indemil, therefore, argues the service did not comply with the Convention and is void.

Not so. The right to object to service of process "can, like other such rights, be waived." *Compagnie des Bauxites de Guinee*, 456 U.S. at 703. *See Creighton v. Kerr*, 87 U.S. 8, 12 (1873) ("A general appearance waives all question of the service of process."); *Consol. Sun Ray, Inc. v.*

---

[9] Since GCC does not argue that service followed the requirements of the Convention, the Court will not evaluate the various methods of service permitted therein.

*Steel Ins. Co. of Am.*, 190 F. Supp. 171, 174 (E.D. Pa. 1961) (concluding defendant, in agreeing to contract with "service of suit clause, . . . . waived its right to object to venue or to any irregularity or defect in the service of process."); Fed. R. Civ. P. 12(h). Indeed, "it is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether." *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16 (1964). And the procedures in Rule 4, including service through the Convention, "need not be followed where the parties agree to another form of service." *Terra Nova Trading Inc. v. Cashew Indus. W. Africa*, 732 F. Supp. 3d 363, 368 (D.N.J. 2024).

The forum selection clause in the Purchase Orders provides: "[e]ach party hereby authorizes and accepts service of process . . . by registered or certified mail, return receipt requested, postage prepaid, to its address for the giving of notices as set forth in this Contract." (Purchase Order 1723 at *131; Purchase Order 1724 at *140.) As before, the forum selection clause controls. Indemil agreed to service by registered mail. GCC served Indemil by registered mail.[10] Indemil cannot hide behind a right it willingly bargained away.[11]

---

[10] The Court notes "it is common practice in many commercial contexts," especially in international contracts, for the parties to incorporate service provisions into their contracts." 4 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1062 (3d ed.). lndemil's position, therefore, would "inevitably result in the invalidation of similar bargained for contractual provisions in a multitude of international contracts." *Revman Int'l, Inc. v. SEL Mfg. Co.*, No. 17-1944, 2019 WL 10893956, at *4 (D.S.C. Mar. 26, 2019). Displacing "the bargained for risks in commercial agreements has the potential to disrupt international trade." *Id.* And "[i]t cannot have been the intention of the Hague Convention, nor of [Brazil], to prohibit [Brazilian] citizens from entering into contracts which provide for alternate service." *Id.*

[11] Other courts have reached the same conclusion. *See, e.g.*, *Revman Int'l, Inc.*, 2019 WL 10893956, at *5 (D.S.C. Mar. 26, 2019) (denying defendant's attempt to "void a freely bargained for provision of the Contract and hide behind the Hague Convention to escape the consequences of its actions."); *Masimo Corp. v. Mindray DS USA Inc.*, No. 12-2206, 2013 WL 12131723, at *3 (C.D. Cal. Mar. 18, 2013) ("The Court sees no reason why parties may not waive by contract the service requirements of the Hague Convention, especially given that parties are generally free to agree to alternative methods of service."); *Alfred E. Mann Living Tr. v. ETIRC Aviation S.a.r.l.*, 78 A.D.3d 137, 141, 910 N.Y.S.2d 418 (2010) ("[P]recluding a contractual waiver of the service provisions of the Hague Convention would allow people to unilaterally negate their clear and unambiguous written waivers of service by the simple expedient of leaving the country.")

Indemil argues it never waived its right to service under the Convention, relying on the waiver factors articulated in *Martelack v. Toys R US*, No. 13-7098, 2016 WL 762656 (D.N.J. Feb. 25, 2016). That reliance is misplaced. *Martelack* observed, in the context of a contract waiving the right to a jury trial, waiver is knowingly and voluntarily made if: "(1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous." *Id.* at *7 (quoting *First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001)). This case does not involve waiver of the right to a jury trial. Unlike a jury waiver, which carries a presumption against enforcement, the service of process provision was a negotiated contract term, signed and agreed to on four occasions by the parties. Even if the *Martelack* factors were relevant, which they are not, none are met. The parties are both sophisticated business entities with no disparity in bargaining power and had ample opportunity to negotiate this contract. Indemil, a company with over $10 million in annual revenue and hundreds of employees, engaged in extensive negotiations and meetings over multiple deals, including phone calls, emails, and in-person meetings. Indemil, therefore, fails to show its contractual waiver of service under the Convention was ineffective. Thus, GCC properly served Indemil under the Purchase Orders. Indemil's motion to dismiss for improper service is **denied**.

Accordingly, Indemil's motion to dismiss is **denied** in its entirety.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Defendant's motion to dismiss (ECF No. 23) is **DENIED**. An appropriate Order accompanies this Opinion.

**DATED:** December 23, 2025

HONORABLE JULIEN XAVIER NEALS
United States District Judge